IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DONALD RUDOLPH STOCK, | CV 14-25-H-DLC-JTJ |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS AND ORDER OF UNITED STATES MAGISTRATE JUDGE |
| MARTIN FRINK; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On April 21, 2014, Petitioner Donald Rudolph Stock filed an application for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Mr. Stock is represented by Bryan C. Tipp and *pro hac vice* counsel Todd Maybrown. (Docs. 2, 5.)

On September 8, 2014, based on Mr. Stock's suggestion that the Court "may want to allow for a stay and abeyance of this Petition to afford the Montana courts an opportunity to consider" his claims, Pet. (Doc. 1) at 17 ¶¶ IV.A.26, B.28; *see also id.* at 26 ¶ V.8, the Court ordered Mr. Stock to clarify whether he intended to conduct any further litigation in state court. (Doc. 6.) On September 18, 2014, Mr. Stock clarified that he believes any return to state court would be futile. Resp. to Order (Doc. 7) at 6.

Respondent ("the State") was then ordered to file an Answer, accompanied

1

by exhibits not yet in the record, to Mr. Stock's petition.  (Doc. 8.)  The State filed the Answer and Exhibits on November 24, 2014.  (Docs. 11-12.)  Mr. Stock filed a timely Reply to the State's Answer.  (Doc. 13.)

## I.    Procedural History

In the original Information in this case, the State charged Mr. Stock with one count of Incest.  On May 28, 2009, Mr. Stock appeared before the First Judicial District Court and entered a not guilty plea.  (Doc. 12-8 at 1.)  Subsequently, the State filed an Amended Information, charging Mr. Stock with: Count I, Incest (Common Scheme); Count II, Tampering with Physical Evidence; and Count III, Incest (Common Scheme).  *Id*.  On September 9, 2009, Mr. Stock appeared and entered a not guilty plea to the Amended Information.  *Id*. at 2.  Mr. Stock was represented by attorney Chad Wright during all pretrial proceedings.

On March 8, 2010, the jury trial began.  At trial, Mr. Stock was represented by Wright and co-counsel Gregory A. Jackson.  *Id*.  The trial concluded on March 17, 2010; the jury found Mr. Stock guilty of all charges.  *Id*.  On June 11, 2010, a sentencing hearing was held.  On Count I, Mr. Stock was sentenced to 50 years at the Montana State Prison ("MSP"), with 25 years suspended.  On Count II, Mr. Stock received a sentence of ten years at MSP.  On Count III, Mr. Stock was sentenced to 50 years at MSP, with 25 years suspended.  *Id*. at 3.  The sentences were ordered to run concurrently to one another.  *Id*.  Additionally, the trial court

2

ordered that Mr. Stock not be parole eligible until his youngest child reached the age of 18.  *Id*.

Mr. Stock filed a direct appeal of his sentence, arguing the trial court erred in: (1) permitting Mr. Stock's minor daughter, K.S., to testify outside the presence of both Mr. Stock and the jury, in violation of Mr. Stock's state and federal right to confrontation; (2) barring the defense from forensically interviewing and calling Mr. Stock's minor son, Z.S., as a witness at trial; and (3) permitting introduction of testimony regarding pornographic computer images seized from Mr. Stock's computer under the transaction rule.  (Doc. 12-11 at 1-21); *see also* (Doc. 12-12); *State v. Stock*, 256 P.3d 899, 900 (Mont. 2011).  Wright represented Mr. Stock on appeal.

The Montana Supreme Court denied Mr. Stock's appeal.  First, the Court concluded Mr. Stock's constitutional right to confront witnesses against him was not violated when K.S. testified via two-way electronic audio-video communication.  *Stock*, 256 P.3d at 903.  The Court determined the trial court made an adequate case-specific inquiry when it determined that a necessity for video testimony existed.  *Id*. at 905.  Further, the Court found that the Montana statutes allowing for such a procedure were constitutional.  *Id*.

Second, the Court found that the trial court did not abuse its discretion by refusing to allow Mr. Stock to forensically evaluate or subpoena for trial four-year

old Z.S. Given his young age, his inability to distinguish between the truth and lies, his lack of personal knowledge of Mr. Stock's abuse or absence of abuse, and the potential for ensuing psychological harm, the trial court's ruling was proper. *Id*. at 907.

Finally, the Court declined to reach the merits of Mr. Stock's objection to the admission of summary testimony relating to the pornographic computer images, finding that Mr. Stock failed to adequately preserve the issue for appeal. *Id*. at 908. Mr. Stock had filed a motion in limine challenging the admissibility of the pornographic images themselves. However, because the motion did not preserve an objection relating to a summary description of the images during trial and Mr. Stock did not raise a contemporaneous trial objection to the summary testimony, there was no issue preserved for appeal. *Id*.

Mr. Stock petitioned the United States Supreme Court, arguing that the trial court's decision to permit K.S. to testify via two-way video violated his Sixth Amendment right to confrontation. The Court denied the petition for a writ of certiorari. (Doc. 12-13.)

Mr. Stock then filed for postconviction relief; Wright continued to represent him. Mr. Stock argued that trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for: (1) failing to consult with a forensic computer examiner; (2) failing to object to the admission of the pornographic

computer evidence during trial; and (3) failing to object to improper statements made during the State's closing argument in relation to DNA evidence. (Doc. 12-15 at 12-13.) Mr. Stock also argued that his due process rights were violated when: (1) the prosecution presented misleading testimony about the computer evidence and then subsequently destroyed the computer; and (2) the prosecution presented misleading statements in closing regarding the DNA evidence. *Id*. at 13-14.

The court denied Mr. Stock's postconviction relief petition without a hearing. (Doc. 12-17.) As a preliminary matter, the court found:

> Based on a review of the criminal proceedings, the Court believes overwhelming evidence was presented to the jury, and Stock was correctly convicted and sentenced. Qualitatively, comparing the overwhelming admissible evidence the State presented, including E.S. and K.S.'s testimony, Stock's recorded statements, Stock's actions in tampering with evidence by washing E.S.'s sheets and placing brand new sheets on E.S.'s bed, and the wealth of testimony presented at trial, there is no reasonable probability that even if the Court ruled in Stock's favor on all three [ineffective assistance of counsel] issues presented that the outcome of trial would be different. Further, any purported error in allowing or disallowing evidence or testimony was harmless in the face of the overwhelming evidence of Stock's guilt.

*Id*. at 2. The postconviction court also noted that "Wright did an excellent job in identifying pretrial issues and presenting relevant motions on Stock's behalf." *Id*. at 4. Also, the court observed that Mr. Stock, via Wright, was only claiming ineffective assistance against Wright and not against co-counsel Gregory Jackson in the postconviction proceedings. *Id*. at 3.

In relation to Wright's failure to object to the summary testimony relating to the pornographic images and search terms, the court determined that the trial court would likely have overruled any such objection because the trial court made it clear the pornographic computer evidence was directly related to the molestation charges. *Id*. at 7. Further, because the evidence was described to the jury and the actual images themselves were not shown, no prejudice occurred. *Id*. Finally, because the trial court overruled Mr. Stock's contemporaneous trial objection to Exhibit 74, it was reasonable to conclude that any objection to Exhibits 75-79 would likewise have been overruled. *Id*. Thus, there was no basis for an ineffective assistance of counsel claim. *Id*.

The postconviction court also found that Mr. Stock had failed to demonstrate any prejudice for counsel's failure to hire a computer expert. Though someone else may have accessed the images using the Don Stock username and password, the court did not believe that it was reasonably probable that the jury would have reached a different verdict had Mr. Stock retained an expert on the issue. Mr. Stock was "splitting hairs as to both the relevance and weight of this purported theory." *Id.* at 10. There was no prejudice because there was no showing that the allegedly deficient performance rendered the trial fundamentally unfair. *Id*.

Finally, the court found that there was no ineffective assistance of counsel for failure to object to the allegedly improper closing statement by the State that

Mr. Stock's DNA was "all over" E.S.'s bed sheets. Apparently, Mr. Stock had the opportunity to test the sheets pretrial but elected not to do so for fear that the results could lead to potentially incriminating results. *Id*. at 11. Based upon the forensic testimony, the court held that the State did not mischaracterize the DNA evidence recovered from the mattress. *Id*. at 13. Additionally, in light of Mr. Stock's admission that he washed the sheets and placed them in a storage area under the stairs and the two lengthy interviews Mr. Stock gave to law enforcement, any error that may have occurred was harmless. *Id*.

Mr. Stock appealed the denial of his postconviction petition, arguing errors of defense counsel and prosecutorial misstatements affected the outcome of the trial. (Doc. 12-18.) Wright again represented Mr. Stock. Specifically, Mr. Stock argued that (1) the evidence at trial was not "overwhelming" and the postconviction court erred in so finding (*id*. at 9-19); and (2) counsel was ineffective for failing to object to the computer testimony (*id*. at 28), failing to consult a forensic computer expert (*id*.), and failing to object during the State's closing (*id*. at 29).

The Montana Supreme Court noted Mr. Stock was represented in the postconviction case by the same counsel (Wright) who Mr. Stock alleges provided deficient representation at his trial, placing Wright in the position of both advocate and witness. Despite the ethical concerns implicated by this scenario, the Court

concluded Mr. Stock failed to make a sufficient showing on the prejudice prong of Strickland. *Stock v. State*, 318 P.3d 1053 (Mont. 2014). The Court observed that Mr. Stock had failed to address the first prong of *Strickland*—i.e. whether counsel's performance "fell below an objective standard of reasonableness." *Stock*, 318 P. 3d. at 1058. The Court stated that even if it were inclined to agree with Mr. Stock's arguments relating to prejudice, it could not grant relief absent a showing that it was the unreasonable actions of counsel that caused the prejudice. *Id*. The Court proceeded to analyze the merits of Mr. Stock's claims under the second prong of *Strickland* without considering whether counsel's performance was objectively reasonable. *Id*.

The Court stated that "[e]ven if Wright's failure to properly object [to the computer image testimony] fell below an objective standard of reasonableness, such an error does not warrant setting aside Stock's judgment unless the error would have had an effect on the judgment." The Court concluded that even if Wright had renewed his objection, the trial court likely would have overruled the objection and allowed the testimony. *Id*. at 1059. Thus, the only prejudice Mr. Stock suffered was that he was precluded from raising this issue on appeal; however, there was no support offered for a claim that Mr. Stock would have received a different outcome on appeal had Wright made a timely objection to the electronic evidence. *Id*.

The Court also determined that, assuming Wright was deficient for failing to hire a computer expert, Mr. Stock was unable to establish the requisite prejudice under *Strickland*. *Id.* at 1060. A witness testified at trial that he had seen E.S. use Mr. Stock's computer on multiple occasions; thus, the jury was able to infer that it was possibly E.S., not Mr. Stock, who had accessed the information at issue. *Id.* This testimony established the same inference that a forensic computer analyst would have established—the jury was able to question who was responsible for accessing the information. *Id.* There was no reasonable probability that but for the failure to hire the computer expert, the result of the trial would have been different. *Id.*

Finally, in relation to Mr. Stock's claim of ineffective assistance for failing to object to the prosecutor's closing remarks that Mr. Stock's DNA evidence was "all over" E.S.'s sheet, even assuming deficient performance, Mr. Stock failed to establish prejudice. *Id.* It was established during trial that Mr. Stock's DNA was present in five of the seven mixed samples obtained from the mattress. The Court reasoned that, even if the jury understood the phrase "all over" to be literal in its meaning, there was support for such an interpretation. *Id.* Additionally, the jury was told that statements made during closing remarks were not to be considered evidence. Because Mr. Stock's claim of prejudice was unsupported by Wright's failure to object, it too failed. *Id.*

## II.    Mr. Stock's Claims

In his present petition, Mr. Stock raises claims of Ineffective Assistance of Postconviction Counsel and Ineffective Assistance of Trial Counsel.

### Claim 1: Ineffective Assistance of Postconviction Counsel and Due Process Violation by the State

> Wright was conflicted due to a conflict of interest; by allowing Wright to continue as postconviction counsel, the Montana courts violated Mr. Stock's right to due process (Doc. 1 at ¶¶ II.A.10- ¶ II.A.12).

### Claim 2: Ineffective Assistance of Trial Counsel

a) Failure to object to admission of pornographic image testimony during trial (*id*. at 17-18, ¶ IV.B.3);

b) Failure to obtain a computer expert (*id*. at 18, ¶ IV.B.4);

c) Failure to object to State's DNA comments in closing (*id*. at 19 ¶ IV.B.7);

d) Failure to preserve objection to pornographic images and/or computer usage for appeal (*id*. at 18 ¶ IV.B.5);

e) Failure to retain own DNA expert to clarify/explain DNA findings (*id*. at 19 ¶ IV.B.7);

f) Conflict of interest due to counsel's relationship with Dr. Keefe that resulted in trial counsel's failure to perform an effective cross-examination, presentation of damaging testimony, and failure to perform an adequate pretrial investigation into medical issues (*id*. at 20-1 ¶ IV.B.10-13)

g) Failure to present testimony from medical expert that the sexual assault described by K.S. would have significant medical consequences (*id*. at 21 ¶ IV.B.13);

h) Failure to object to the joinder of charges involving E.S. and K.S. (*id*. at IV.B.15); and

    i)    Failure to object to the following irrelevant and prejudicial evidence:

1. State referring to E.S. and K.S. as "victims";
2. State presenting irrelevant/prejudicial testimony regarding the Lewis and Clark multidisciplinary team;
3. State presenting testimony that E.S. and K.S. suffered from posttraumatic stress disorder and presuming that the condition was caused by Mr. Stock;
4. State presenting prejudicial testimony to bolster credibility of complaining witnesses;
5. State presenting prejudicial and irrelevant testimony relating to Mr. Stock's character, personality, activities, and reasons the witnesses did not like Mr. Stock;
6. State presenting irrelevant and prejudicial testimony regarding Mr. Stock's religious beliefs;
7. State presenting evidence that was prejudicial only to bolster the credibility of the State's own witnesses; and
8. State presenting other evidence that was unfairly prejudicial or only served to generate sympathy for E.S. and K.S.

(*id*. at 21-22 ¶¶IVB.16 & IV.B.18). Mr. Stock asks this Court to allow further discovery, allow him to expand the record, and hold an evidentiary hearing. *Id*. at 25 ¶¶ V4-6.

## III.   Analysis

All claims in Mr. Stock's federal petition allege that Wright provided ineffective assistance of counsel. These claims are governed by the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). At this stage of the proceedings, Mr. Stock must allege facts sufficient to support inferences that Wright's representation fell below an objective standard of reasonableness,

*Strickland*, 466 U.S. at 688, and a reasonable probability that but for Wright's errors the result of the proceeding would have been different. *Id*. at 694.

The Court explains below the reason for its recommendation as to each of Mr. Stock's claims. Mr. Stock's claims fall into one of the following categories. Regardless of the state court proceedings, Claim 1 regarding the ineffective assistance of postconviction counsel and the purported due process violation, as well as Claim 2(i) regarding the failure to object to irrelevant and prejudicial evidence, are conclusively lacking in merit and should be denied for failure to state a claim under 28 U.S.C. § 2254(a). While one or more allegations in these claims might be relevant to Mr. Stock's ability to excuse procedural default, they fail as independent claims for federal habeas relief.

The Montana Supreme Court reasonably denied Claims 2(a), 2(b), and 2(c) for lack of merit, so those claims should be denied under 28 U.S.C. § 2254(d). Claims 2(d), 2(f), and 2(h) were never presented in the state courts, and Mr. Stock's attempt to excuse his default fails; thus, they should also be dismissed with prejudice.

Although Claims 2(e) pertaining to the failure to retain a DNA expert and 2(g) regarding failure to present medical expert testimony are procedurally barred, Mr. Stock's proffered excuse for any default might prevail, and the claims might prove meritorious. Mr. Stock is entitled to go forward on these two claims.

*Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1318 (2012), would be a dead letter if ineffective counsel's failure to support a postconviction claim meant that the federal petitioner "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). Therefore, Mr. Stock may develop the evidentiary basis of his defaulted claims and of *Martinez* cause without meeting the stringent criteria of § 2254(e)(2)(A) or (B). The Court makes no decision at this time as to the application of 28 U.S.C. § 2254(e)(1) to the remaining claims.

For the following reasons, Claim 1 and Claims 2(a),(b),(c),(d), (f),(h), and (i) should be denied or dismissed with prejudice. Further proceedings are required on Claims 2(e) and 2(g).

**A. 28 U.S.C. § 2254(a): Claim 1 and Claim 2(i)**

**1. Claim 1**

A habeas claim is cognizable only when it is based upon the ground that an individual is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Prisoners do not "have a constitutional right to counsel when mounting collateral attacks upon their convictions." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see also Murray v. Giarratano*, 492 U.S. 1 (1989). Mr. Stock argues that this longstanding principle has been called into question in light of *Martinez* and *Trevino v. Thaler*, __ U.S. __, 133 S. Ct. 1911 (2013). *See* (Doc. 1 at 15). Currently, no such exception exists. In fact, in

*Martinez*, the Court acknowledged the potential for an exception to the constitutional rule but clearly stated that it would not effectuate such a change in that case. *See Martinez*, 132 S. Ct. at 1315.

Mr. Stock cites *Wood v. Georgia*, 450 U.S. 261 (1980), and *Culyer v. Sullivan*, 446 U.S. 335 (1980), in support of his argument that the State should have inquired as to a potential conflict of Wright's continued representation and the failure to do so resulted in a due process violation. The problem with Mr. Stock's reliance upon those cases is that they turn on the constitutional right to counsel. *See, e.g., Wood*, 450 U.S. at 271 ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."). Mr. Stock had no such right during his postconviction proceedings. Moreover, the validity of Mr. Stock's claim should be analyzed by the specific Sixth Amendment right to counsel standard rather than the Fourteenth Amendment's more generalized due process provision. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Albright v. Oliver*, 510 U.S. 266, 274 (internal quotation marks omitted) ("Where a particular Amendment provides an explicit textural source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.").

Because Mr. Stock had no right to counsel in his postconviction proceedings, his claim is not cognizable in habeas. Claim 1 should be dismissed.

## 2. Claim 2(i)

Mr. Stock asserts that the State introduced eight types of information to which the defense failed to object, constituting ineffective assistance of counsel. Mr. Stock does not state with specificity the facts supporting each contention. Additionally, he fails to explain what was unreasonable about trial counsel's performance or how the case was prejudiced.

Moreover, Mr. Stock's conclusory allegations do not comply with the dictates of Rule 2(c) of the Rules Governing Section 2254 Cases. *See Mayle v. Felix*, 545 U.S. 644, 661 (2002) (Rule 2(c) requires pleading "separate congeries of facts" in support of each ground for relief); *Blakledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (stating that "notice" pleading in habeas is insufficient and "petition is expected to state facts that point to a real possibility of constitutional error") (quoting Advisory Committee Note to Rule 4, Rules Governing Section 2254 Cases) (internal quotation marks omitted).

Claim 2(i) is defective because it does not provide sufficient facts in support to enable this Court to determine whether further habeas review is warranted. This Court's independent review of the record has not revealed prejudicial impact to Mr. Stock in relation to any of the areas outlined. "[C]onclusory statements are no

substitute for proper allegations of fact" and do not warrant habeas relief. *Bohme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970). Claim 2(i) should be dismissed.

### B. 28 U.S.C. § 2254(d): Claims 2(a), 2(b), and 2(c)

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000). Under Section 2254(d), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See also Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision' " of the Supreme Court and nevertheless arrives

at a result different from the Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. at 405-406).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, __ U.S. __, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted). The standard is "difficult to meet," and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted). "Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult. The standards created by *Strickland* and §2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at

105 (2011) (internal citations omitted).

For the reasons explained below, Mr. Stock's ineffective assistance of counsel Claims 2 (a), (b), and (c) should be denied. Mr. Stock has failed to establish that the Montana Supreme Court's decision on the merits resulted in a decision that was contrary to clearly established federal law or that was based on an unreasonable determination of the facts in light of *Strickland.* Thus, this Court must afford deference to the decision of the Montana Supreme Court.

## 1. Claim 2(a): Trial counsel's failure to object to admission of pornographic image testimony

Although it did not address the first prong of *Strickland*, the Montana Supreme Court held that Mr. Stock could not establish prejudice because the trial court likely would have overruled any objection made. *Stock*, 318 P.3d at 1059-60.

There is support for this finding in the record. Prior to the jury trial, the trial court ruled that the computer evidence and search terms were admissible at trial under the transaction rule and Montana Rule of Evidence 404:

> Generally, when a defendant is put on trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone. Evidence which in any manner shows, or tend to show, he has committed another crime wholly independent, even though it is a crime of the same sort, is irrelevant and inadmissible, subject to certain exceptions.
>
> Pursuant to the "transaction rule," evidence of matters which are inextricably linked to, and explanatory of, the charged offense is admissible notwithstanding the rules relating to "other crimes" evidence.

> It is well established that evidence which tends to explain circumstances surrounding the charged offense is relevant, probative, and competent. When the court is not dealing with the introduction of evidence of wholly independent or unrelated crimes, the evidence is properly admitted.
>
> In the present case, Defendant has been charged with incest against his two children over a lengthy period of time. The pornographic evidence obtained from his computer is directly related to the elements of the crime charged. The pornographic evidence obtained from Defendant's computer is not independent of the offenses charged with respect to both children. Most of the pornography retrieved pertained to homosexual activity involving young males. However the search terms used pertained to both genders, as well as to young children: "gay teen sex video," "Twinksfun," "Teenboyslove," and "7 year old having sex." The subject evidence from Defendant's computer is therefore admissible under the transaction rule.

(Doc. 12-17 at 5-6, citing *State v. Stock*, ADC-2009-183, Or. Mot. Exclude Evid.,

at 2 (Dec. 22, 2009), citing *State v. Trombley*, 620 P.2d 367, 368 (Mont. 1980);

*State v. Lozon*, 85 P.3d 753 (Mont. 2004).)

As noted by both the postconviction court and the Montana Supreme Court,

the prosecution had the investigating agent describe the above evidence to the jury,

rather than introducing the images themselves, even though it was apparent that the

trial court would have allowed in the actual images. The State through its agent

also introduced Exhibits 74-79, which set forth the internet search terms used on

Mr. Stock's computer.

The State proceeded under a theory of incest via common scheme, namely

that Mr. Stock had groomed and abused E.S. over a period of years and

subsequently began the same process with K.S.  Following K.S.'s disclosure that

Mr. Stock had showed her a computer image of a little green man exposing his

"booty," a warrant was obtained to search Mr. Stock's computer.  While searching

the computer for the image described by K.S., agents discovered pornographic

images and obtained a subsequent search warrant.  The second search led to the

testimony of Agent Cooperider regarding the pornographic images and applicable

search terms.  The evidence and testimony with which Mr. Stock takes issue was

relevant to both the investigation and the State's overall case.  Moreover, as

outlined by the trial court and affirmed in subsequent decisions, this information

was also probative.  Finally, as discussed below, defense counsel was able to elicit

testimony at trial that someone other than Mr. Stock could have accessed to the

computer and entered the search terms.

The Montana Supreme Court's finding that Mr. Stock failed to establish

*Strickland* prejudice in relation to the computer evidence was reasonable and

should be afforded deference.

### 2.  Claim 2(b):     Trial counsel's failure to obtain a computer expert

The Court found that Mr. Stock failed to establish prejudice in relation to

counsel's failure to hire a forensic computer expert.  This finding, too, is

reasonable.

On cross-examination, the State's computer expert, Agent Cooperider,

conceded that he could not say it was Mr. Stock who logged on to retrieve the information at issue. He conceded all he could opine was that someone who knew the account password accessed the information. (Doc. 12-17 at 9.)

During trial the following exchange occurred between Cooperider and Wright on cross-examination:

> Wright: Okay. So, all in all, in summary, even though we have a username on the computer, you can't say who was using the computer at any time?
>
> Cooperider: I cannot put a specific person at the keyboard.
>
> Wright: And you can't say who viewed these images that we've gone through in these selected exhibits.
>
> Cooperider: Correct. All I can say is that someone that knew the password for that account was there.
>
> Wright: And you can't even say if some of the images were viewed or not, right? I mean they can end up on the computer and it may have been that nobody actually viewed those images, even though they were on the computer?
>
> Cooperider: It's possible. Some of them were not viewed just by the caching process.

(Doc. 12-5 at 94-95.)

Also, as the Court observed, defense counsel called a witness at trial who testified seeing E.S. use Mr. Stock's computer:

> thereby allowing the jury to infer through circumstantial evidence that E.S. accessed the electronic evidence, or alternatively, that Stock accessed it. This testimony accomplished the same purpose that [a defense expert] would have . . . it would have caused the jury to

question who was responsible for accessing the evidence.

*Stock*, 318 P.3d at 1060.

In closing, Wright stressed this point to the jury:

> Darren Judd comes in here and tells you, my kids were on that computer, I saw [E.S.] on that computer . . . you can't rely on interest or this idea that there's an interest based on the computer evidence because you can't even determine who was using the computer.

(Doc. 12-7 at 188-189.)[1] Wright also stressed in closing that the State's computer expert acknowledged that he could not say who downloaded the images. *Id.* at 188.

It was not necessary for Mr. Stock to retain his own expert if he was able to use other witnesses and the State's expert to establish that someone other than Mr. Stock could have accessed the computer information at issue. Furthermore, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. Although the defense chose to forego retaining its own expert, it was able to develop the same information via other witnesses—i.e. that someone other than Mr. Stock could have accessed the objectionable computer information. The Montana Supreme Court's finding that Mr. Stock suffered no prejudice was reasonable and should be accorded deference.

### 3. Claim 2(c): Failure to object to State's DNA comments in closing

---

[1] These page numbers refer to the page numbers listed on the original transcript.

Mr. Stock contends that trial counsel was ineffective for failing to address the State's comment in closing that his DNA was "all over" E.S.'s bed. The Montana Supreme Court determined that Mr. Stock failed to establish prejudice under the second prong of *Strickland*. First, the Court questioned whether the phrase "all over" was to be taken literally, but found, even if it was literal, the evidence showed that Mr. Stock's genetic material was found on five of the seven samples taken from the mattress. *Stock*, 318 P.3d at 1060. Mr. Stock failed to demonstrate that any confusion about the DNA testimony stemmed from this statement. *Id*. Likewise, the jury was advised that closing statements were not to be considered as evidence. *Id*.

The objectionable argument made by the State in its rebuttal close was this:

> Ask yourself how is it that Don Stock's DNA is all over the bed? Everyplace it's just – and it's not spiked where the semen is, it is all over that bed. This isn't his bed, this is the boy's bed. And it is very unlikely, according to [the crime lab analyst], that you are going to get some sort of transfer of DNA via communaling [sic] laundry.
>
> And ask yourself when you make a bed, do you smooth the sheets on top of it or do you smooth the mattress top?

(Doc. 12-7 at 201.)

Mr. Stock fails to acknowledge that the State made this comment during its rebuttal closing in response to this argument advanced by Wright during the defense's closing:

> Instead, they focus on the DNA on [E.S.'s] mattress, even though it's

23

the same—in the stains, the same amount of DNA in the stains as it is outside of the stains. But if they were just looking for Don's skin, why didn't they test [K.S.'s] bed, right? Because skin is only relevant—in this circumstance, with Don making the bedding, doing the laundry, changing all these things, skin is only relevant if it's associated with the stain. And those experts came in and said, I can't tell you because the proportions are the same inside the stain, the proportion [sic] are the same outside the stain. That means the skin could have been there, the stain came on top.

So, maybe there's a more practical solution, right? When the DNA can't really tell you anything and it doesn't help us, doesn't hurt us, it doesn't mean much of anything, what should we be looking for?

*Id*. at 186-187.

The statement with which Mr. Stock takes issue, that the semen was "all over the bed," was made in direct response to Wright's minimization of the DNA evidence and his hypothesis that Mr. Stock's DNA was on E.S.'s mattress because Mr. Stock did the laundry and made the bed. Wright argued that because of these activities it would be expected that Mr. Stock's DNA would be found on the mattress in areas outside of the semen stains. In essence, Wright was arguing that it was to be expected that Mr. Stock's DNA was "all over" the bed in the form of skin cells and the fact that E.S.'s semen was found on separate discrete spots, possibly deposited on top of the skin cells transferred from Mr. Stock's routine household chores, was not probative of sexual contact. It was Wright's theory that the DNA evidence was neutral. The State's response that Mr. Stock's DNA being "all over" responded to this argument.

Mr. Stock has not established prejudice in relation to this claim. Given the high level of deference due, there is no indication that the Montana Supreme Court's decision was unreasonable. Accordingly, this claim also fails.

### C. Procedurally Defaulted Claims

"Where a Montana federal habeas petitioner raises in federal court a substantial non-record-based [ineffective assistance of counsel] claim he defaulted in his first postconviction proceeding in the Montana trial court, lack of effective counsel qualifies as cause for procedural default." *See, e.g.,* Or. re: *Martinez v. Ryan* (Doc. 50), *Miller v. Kirkegard*, No. CV-13-13-DWM (D. Mont. filed May 29, 2015) (internal quotation marks and citation omitted). To establish "cause" to overcome procedural default under *Martinez*, Mr. Stock must show: (1) the underlying ineffective assistance of trial counsel claim is "substantial"; (2) Mr. Stock had ineffective counsel during the postconviction review proceeding; (3) the state postconviction review proceeding was the initial review proceeding; and (4) state law required the petitioner to bring the claim in the initial review collateral proceeding. *Trevino*, __ U.S. at __, 133 S. Ct. at 1918.

There is no dispute in relation to elements three and four; this Court has previously determined that in the majority of cases, Montana does not permit a petitioner to bring a claim of ineffective assistance of counsel on direct appeal. Generally, a petitioner must bring them in a collateral postconviction review

proceeding.  Thus, to establish cause for the procedural default, Mr. Stock must

show the first two *Martinez* elements: (1) that his claims are substantial; and (2)

that his postconviction counsel was ineffective under *Strickland*.

To raise a "substantial claim," Mr. Stock must demonstrate that the claim

has some merit.  *Martinez,* 132 S. Ct. at 1318.  A claim is "insubstantial" if "it does

not have any merit or . . . is wholly without factual support."  *Id*. at 1319.

### i)     Insubstantial Claims: 2(d), 2(f), 2(h)

As discussed below, Mr. Stock cannot show that Claims 2(d), 2(f), or 2(h)

are "substantial"; thus he cannot establish cause to excuse the procedural default,

and they should be dismissed.

### 1.   Claim 2(d): Failure to preserve objection to pornographic images and computer usage for appeal

As set forth above, Mr. Stock attempted to argue on direct appeal that the

trial court abused its discretion when it allowed the State to present evidence and

summary testimony regarding pornographic images obtained from Mr. Stock's

computer under the transaction rule.  *Stock*, 256 P.3d at 907.  The Montana

Supreme Court did not reach the merits of this claim, finding that Mr. Stock had

failed to preserve the issue for appeal.  *Id*. at 908.  Though Mr. Stock made a

pretrial objection via a motion in limine, he did not make a specific motion at trial

articulating the grounds for the objection.  *Id*.  Furthermore, Mr. Stock objected to

the pornographic images themselves in his motion in limine; those objectionable

images were not introduced at trial. *Id*. During trial, Agent Cooperider testified to and provided his written summaries of the computer evidence, but the images themselves were never introduced. *Id*.

The Montana Supreme Court held in a later decision that Mr. Stock's counsel was not ineffective for failing to object to this same evidence because the trial court indicated that it was inclined to allow the State to present the evidence to the jury. As set forth above, this Court agrees with the finding that Mr. Stock's counsel was not ineffective for failing to object because no prejudice was established. This Court is hard-pressed, then, to see how failure to preserve the objection to evidence that would have come in regardless constitutes ineffective assistance in this instance. Mr. Stock has not demonstrated a substantial claim; this claim should be denied.

### 2. Claim 2(f): Conflict of interest due to trial counsel's relationship with Dr. Keefe and resultant failure to investigate or effectively cross-examine Dr. Keefe

Mr. Stock contends that due to the prior relationship between Wright and Dr. Keefe, defense counsel failed to adequately perform a pretrial investigation into the medical issues at issue in Mr. Stock's trial, failed to perform an effective cross-examination of Dr. Keefe, and elicited damaging testimony from Dr. Keefe.

The only discussion of a relationship between Wright and Dr. Keefe came at the beginning of Wright's cross examination when he used the example of when he

brought his baby with an unexplained neck injury to see the doctor. (Doc. 12-2 at 146-7.) Wright used this example to illustrate the types of situations that would cause Dr. Keefe's professional "radar" to go up. Referencing his own experience, Wright asked Dr. Keefe if that was the type of situation that, based upon her training and experience, would cause her to look for an injury to a child. Dr. Keefe did not agree that the scenario Wright presented would be such a situation, but rather she stated more generally that when a child comes in with an unexplained injury, it arouses her suspicions. *Id*. at 147. At no time was there an inference that E.S. or K.S. had such "unexplained injuries." At no point was there an inference that Dr. Keefe believed Wright abused his own child.

Although the cross-examination was relatively short, Wright was able to elicit useful information from Dr. Keefe. He also had Dr. Keefe explain what would constitute "clear indicators of abuse"; these included a finding of semen, pregnancy, and sexually transmitted disease. (Doc. 12-2 at 148-9.) Neither E.S. nor K.S. exhibited any of these indicators. Dr. Keefe also stated that not all genital lacerations are indicative of abuse, but that a finding of such a laceration would be highly suspicious. *Id*. at 149. She admitted she did not observe any injuries to E.S., nor did she do a swabbing or use a Wood's Lamp to look for DNA or other biological materials on his body. *Id*. Finally, Dr. Keefe acknowledged that both E.S. and K.S. had completely normal exams. *Id*. at 151.

While ineffective claims are generally subject to *Strickland* analysis, in conflict of interest cases a defendant need not prove prejudice. Rather, prejudice is presumed once a defendant demonstrates that his counsel labored under an "actual conflict of interest." *U.S. v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003), citing *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980). "An actual conflict is a conflict that *affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Id.*, citing *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in the original). A "showing must be made that counsel was influenced in his basic strategic decisions" by the competing loyalty. *Id.* Mr. Stock is unable to make such a showing regarding Dr. Keefe.

Aside from the fact that Wright took his child to Dr. Keefe on a prior occasion, there is no indication that they had any type of meaningful relationship. Mr. Stock has failed to allege any facts that the relationship between Wright and Dr. Keefe influenced Wright and, in turn, adversely affected Mr. Stock's defense. Mr. Stock has not alleged facts supporting an inference that Wright was divided in his loyalties. A review of the record does not show any conflict that would have impacted the nature of Dr. Keefe's testimony. Additionally, Mr. Stock has not demonstrated a viable alternative litigation strategy he believes Wright should have pursued with Dr. Keefe during cross-examination. *Rodrigues*, 347 F.3d at 824. Wright elicited some helpful information from Dr. Keefe. Most importantly, he

was able to underscore the fact that neither E.S. nor K.S. exhibited any findings that would be consistent with sexual abuse during their exams. Mr. Stock has not established that Wright's decision-making was influenced by a loyalty to Dr. Keefe. Mr. Stock has not demonstrated a substantial claim.

### 3. Claim 2(h): Failure to object to the joinder of charges involving E.S. and K.S.

Mr. Stock contends that trial counsel was ineffective for failing to file a motion to sever the charges involving E.S. and K.S. and obtain separate trials. In Montana:

> Two or more offenses or different statements of the same offense may be charged in the same charging document in a separate count, or alternatively, if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same transaction connected together or constituting part of a common scheme or plan.

Mont. Code Ann. § 46-11-404(1). A defendant may move to sever charges that have been joined under Montana Code Annotated § 46-13-211(1). "The burden is on the defendant to prove that severing the charges pursuant to Montana Code Annotated § 46-13-211(1) is necessary to prevent unfair prejudice." *State v. Harlson*, 150 P.3d 349, 357 (Mont. 2006). "This burden cannot be met by proving either that the defendant will face some prejudice from the joint trial or will stand a better chance of acquittal in separate trials; rather, the defendant must prove the prejudice is so great as to prevent a fair trial." *Id.*

Considerations of judicial economy exert strong pressure in favor of joining related offenses. *State v. Topp*, 75 P.3d 330, 331 (Mont. 2003). Factors Montana courts are to consider when analyzing whether counts are of a similar character include: whether the charges are brought under the same statute; whether the charges involve similar victims, location, or modes of operation; the time frame within which the charges occurred; and the geographical area within which the charges occurred. *State v. Freshment*, 43 P.3d 968, 975 (Mont. 2002); *State v. Southern*, 980 P.2d 3, 9 (Mont. 1999).

In *State v. Duncan*, 183 P.3d 111 (Mont. 2008), multiple counts of sexual assault and sexual intercourse without consent were deemed properly joined for trial where three of the charges were brought under the same statute, two of the offenses involved the same alleged victim, all three alleged victims were female and between the ages of nine and fifteen, and each offense occurred at the defendant's home over a period of several months. *Duncan*, 183 P.3d at 117. Similarly, counts of kidnapping, burglary, and theft were all properly joined in an Amended Information with five counts of sexual intercourse without consent when all charges were part of a common scheme involving crimes committed against four elderly victims and overlapping proof was required regarding the charges. *Southern*, 980 P.3d at 10. *See also State v. Hocevar*, 7 P.3d 329, 343 (Mont. 2000); *Freshment*, 43 P.3d at 975-76.

In the instant offense, both the count involving E.S. and the count involving K.S. were charged under same Incest statute, Montana Code Annotated § 45-5-507, as well as under Montana Code Annotated § 45-2-201(8) involving a "common scheme."  Both K.S. and E.S. were Mr. Stock's children; Mr. Stock adopted and raised E.S., and K.S. was Mr. Stock's biological daughter.  The crimes allegedly occurred during an overlapping period of time within the family home, primarily in the bedrooms of E.S. and K.S.  The crimes as charged also involved a similar pattern of conduct, with Mr. Stock entering the child's room late at night, applying a lubricant, and then engaging in anal, vaginal, or oral sex.  Mr. Stock's wife was either at work or asleep when the conduct occurred.  Both children, although employing different terminology, described Mr. Stock carrying semen to the bathroom in his hands and depositing it in the toilet at the conclusion of the sexual encounters.  Certainly both of the charges were of a similar character and involved similar conduct for purposes of joinder analysis.

Wright was nothing if not tenacious in his pretrial representation of Mr. Stock.  The defense filed 25 pretrial motions and briefs, the bulk of which were substantive in nature.[2]  Based on a review of the law regarding joinder and the

---

[2]  Included in these were: Motion to Allow for Defense Witness Interviews (Doc. 12-1 at 3, Dkt. No. 33), Motion for Specific Discovery Items (*id.*, Dkt. No. 40), Motion to Discharge Bail (*id.*, Dkt. No. 43), Motion to Suppress and Brief in Support (*id.* at 4, Dkt. Nos. 57 and 59), Objection to Video Testimony (*id.*, Dkt. No. 58), Objection to State's Motion in Limine re: Testimony of Z.S. (*id.*, Dkt. No. 64), Objection to Consuming DNA Evidence (*id.*, Dkt. No. 63), Motion to Compel Compliance with Court Order for Defense Interviews (*id.* at 5, Dkt. No. 69), Motion to Dismiss Counts I and II for Violation of Right to Speedy Trial and Brief in Support (*id.*, Dkt. Nos. 82 and 84),

effort that Wright expended briefing various issues prior to trial, the Court believes that the failure to move to sever the counts in this case was not an oversight but rather was an informed decision made by counsel. Wright was under no obligation to file a motion lacking in merit. Because Mr. Stock has not established a substantial claim, this should be denied.

### ii) Substantial Claims: 2(e) and 2(g)

As discussed below, Mr. Stock has demonstrated that these claims may have merit and that he may be able to make the requisite showing under *Strickland*; thus, he should be allowed to proceed on these two claims.

### 1. Claim 2(e): Failure to retain DNA expert to explain DNA findings

Mr. Stock contends that his trial counsel was ineffective for failing to retain a DNA expert to clarify to the jury the findings made by the State's DNA expert. It appears that this very issue was discussed prior to trial; however, the record before this Court is very limited. On November 12, 2009, Judge McCarter in a written order noted that Mr. Stock was afforded the opportunity to obtain expert analysis of the State's DNA evidence but elected not to "for fear that the test results might be incriminating and the State would have access to [incriminating test] results." (Doc. 12-17 at 11; *see also* Doc. 12-1 at 5, Doc. 67.) There may

---

Motion for Order Directing Crime Lab to Produce Discovery Material (*id.*, Dkt. No. 102), Motion to Exclude State's Expert Witness and Brief in Support (*id.* at 7, Dkt. Nos. 112 and 113), and Trial Brief (*id.*, Dkt. No. 115).

have been a reasonable trial strategy at play, but there is simply not enough information for this Court to make such a determination. It is unclear whether testing was ever done or whether Mr. Stock's trial counsel consulted with an independent DNA expert prior to trial.

An attorney need not pursue an investigation that could be harmful to the defense, *see Richter*, 562 U.S at 108, but the record before this Court is insufficient as to trial counsel's intention in relation to an expert and whether the failure to seek an expert would constitute objectively substandard performance under *Strickland*. All the information that the Court has in relation to this claim is that Wright retained a DNA expert, Elizabeth A. Johnson, post-trial to aid him in preparation for the postconviction proceedings. (Doc. 12-15 at 33- 35.)

Mr. Stock should be afforded the opportunity to develop this claim further in these proceedings.

> **2. Claim 2(g): Failure to present testimony from a medical expert that the sexual assault described by K.S. would have significant medical consequences**

On its face, the State presents a compelling argument for the denial of this claim. While Mr. Stock did present an affidavit from Dr. Philip Welch (Doc. 1-3), this Court is not convinced that Dr. Welch appreciated or understood the nature of the testimony provided by K.S. Mr. Stock argues that Wright was ineffective for failing to present a defense medical expert who would have testified

that if K.S. suffered the abuse she described, significant injury would have resulted. Specifically, Dr. Welch stated that he was advised by habeas counsel that "during trial the prosecution claimed that Donald Stock had engaged in numerous sexual assaults of K.S. when she was between the ages of 3 and 6 years old, including full penile-vaginal penetration on many occasions." *Id*. at 2, ¶ 4. Dr. Welch reiterated that it was his understanding that "full penile-vaginal" penetration occurred on multiple occasions. *Id*. at 3, ¶ 6.

As the State points out, however, Dr. Welch's understanding is not entirely consistent with K.S.'s actual testimony. K.S. acknowledged doing a "private thing" with Mr. Stock where he would put his "peanuts" in her bottom and also that she would suck on it with her mouth. (Doc. 12-2 at 55.) She also stated that Mr. Stock would apply cream from a bottle to her privates and that he would do the private thing by sticking something in her "crouch." *Id*. at 55-56. K.S. described Mr. Stock putting his "peanuts" or "tail thing" in both her butt and her "crouch" and also described Mr. Stock's "tail thing" as being like her "crouch." She said it was "in the front just like mine, but I don't really have what he has." *Id*. at 58. K.S. talked about Mr. Stock taking "milk" out from her "crouch" after he was wiggling his tail thing too hard. *Id*. at 61. K.S. said that the "wiggling" sometimes hurt. *Id*. at 64. K.S. testified that oral, vaginal, and anal contact had each happened more than once, but did not specify how many times. *Id*. at 66. K.S.

35

explained that sometimes Mr. Stock would do it soft, then hard, then soft, and that he would use his hand to wiggle his "crouch" hard. *Id*. at 62. K.S. stated she knew it was over when Mr. Stock would take the "milk" and flush it down the toilet. *Id*. at 72. While K.S. described these acts in somewhat child-like terms, she made several references to these acts "hurting." While the State may be correct that Dr. Welch did not have a clear understanding of the nature of K.S.'s testimony, it appears that K.S. described penetration on more than one occasion and the pain associated with such penetration.

From the record before the Court, nothing indicates whether defense counsel contacted an independent medical expert. The strategy may have been simply to rely on Dr. Keefe's statement that K.S. had a normal exam and no injuries were apparent. In closing, Wright addressed the lack of injury to K.S., briefly stating:

> Now, unlike [E.S.] who is saying I penetrated my father, she is saying my father is penetrating me. And we have no injury with that. We know from what Dr. Keefe said that at least 75 percent of cases you wouldn't expect to see an injury, even in a penetrating case.

(Doc. 12-7 at 192.) The State posits that calling his own medical expert may have done Mr. Stock more harm than good and that Wright's decision not to call an expert was a "sound strategic decision." (Doc. 11 at 27-28.) Conversely, Mr. Stock argues that Wright failed to make a reasonable rebuttal to the State's medical testimony. (Doc. 13 at 42-44.)

The record before this Court is insufficient to determine whether this was a

defense strategy.  The Affidavit filed by Wright in the postconviction proceedings is silent on this issue.  *See* (Doc. 12-15 at 26-27).  Because K.S. made multiple references to her pain, it certainly may have been advantageous to Mr. Stock to have an expert talk in greater detail about the medical findings and the significance of what was not found.  This Court is not in the position to engage in speculation regarding Wright's action or inaction.  *See Houston v. Schomig*, 533 F.3d 1076, 1082 (9th Cir. 2008).  Mr. Stock should be allowed to move forward on this claim and develop it further in discovery.

Based on the foregoing, the Court issues the following:


## RECOMMENDATIONS

1. Claim 1 and Claim 2(i) should be **DENIED** for lack of merit and for failure to state a claim under 28 U.S.C. § 2254(a);

2. Claims 2(a), (b), and (c) should be **DENIED** because they do not survive deferential review under AEDPA;

3. Claims 2(d), 1(f), and 1(h) should be **DISMISSED WITH PREJUDICE** as procedurally defaulted; and

4. Mr. Stock should be allowed to **PROCEED** on Claims 2(e) and (g).

**NOTICE OF RIGHT TO OBJECT
TO FINDINGS & RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT**

Mr. Stock may object to this Findings and Recommendation within 14 days.[3] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

## ORDER

1. The parties are authorized to depose Chad Wright.

2. The Court advises Petitioner that the burden rests with him. With respect to any allegation that counsel was ineffective, he needs to be prepared to prove prejudice. Whether this will require expert testimony is left to Petitioner to decide.

3. On or before March 18, 2016, the parties shall submit a joint status report to propose a schedule for disposition of this case, including an evidentiary hearing.

DATED this 9th day of February, 2016.

/s/ John Johnston
John Johnston
United States Magistrate Judge

---

[3] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.