IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION



FILED

APR 30 2018

Clerk, U.S. Courts
District Of Montana
Missoula Division

| | |
|---|---|
| DONALD RUDOLPH STOCK, | CV 14–25–H–DLC–JTJ |
| Petitioner, | |
| vs. | ORDER |
| MARTIN FRINK; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

United States Magistrate Judge John Johnston entered his Findings and
Recommendation and Order on August 28, 2017, recommending that Petitioner
Donald Rudolph Stock's ("Stock") two surviving habeas claims be denied for lack
of merit. (Doc. 39 at 16.) Stock timely filed an objection and is therefore entitled
to de novo review of the specified findings and recommendations to which he
objects. 28 U.S.C. § 636(b)(1). Those portions of the findings and
recommendations not specifically objected to will be reviewed for clear error. 28
U.S.C. § 636(b)(1)(A); *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*,
656 F.2d 1309, 1313 (9th Cir. 1981). Clear error exists if the Court is left with a
"definite and firm conviction that a mistake has been committed." *United States v.*

*Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (citations omitted). For the reasons stated below, Judge Johnston's Findings and Recommendations are adopted in full.

## DISCUSSION[1]

Pursuant to this Court's August 5, 2016 Order (Doc. 28) adopting Judge Johnston's February 9, 2016 Findings and Recommendations and Order (Doc. 17), the majority of the claims Stock included in his Petition for Writ of Habeas Corpus (Doc. 1) were either denied or dismissed. Nonetheless, Stock was permitted to proceed with two facets of his claim 2 which, as labeled by Judge Johnston, are referred to as Claims 2(e) and 2(g). (Doc. 17 at 10.) Claim 2(e) alleges ineffective assistance of trial counsel for his failure to retain a DNA expert while Claim 2(g) alleges ineffective assistance of trial counsel for his failure to present testimony from a medical expert. (Docs. 17 at 10; 39 at 1.)

Judge Johnston determined that both Claims 2(e) and 2(g) were procedurally defaulted and that, in order to excuse this default under *Martinez v. Ryan*, 566 U.S. 1 (2012), Stock needed to demonstrate that these claims were substantial and that his post-conviction counsel was ineffective. (Doc. 17 at 25–26.) Because the record was insufficiently established to allow Judge Johnston to determine whether

---

[1] At this juncture, the procedural and factual history of this case is well known to all involved (*See* Doc. 17 at 2–9) and will not be recounted here to the extent unnecessary to an explanation of the Court's decision.

these claims were substantial, Stock was permitted to proceed with both claims and to develop them further through discovery. (*Id.* at 34, 37.) After these claims had been further developed, Judge Johnston issued the Findings and Recommendations presently before the Court. (Doc. 39.)

In order to establish cause to overcome his procedural default under *Martinez*, Stock must show: (1) the underlying ineffective assistance of trial counsel claim is substantial; and (2) he was not represented or had ineffective counsel during his post-conviction relief proceedings.[2] *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014). The first prong of the test requires that "the underlying ineffective assistance of counsel claim be 'substantial.' Under that standard, an underlying claim is 'insubstantial' if it 'does not have any merit or . . . is wholly without factual support.'" *Smith v. Ryan*, 823 F.3d 1270, 1296 (9th Cir. 2016) (quoting *Martinez*, 566 U.S. at 15–16). To assess whether a petitioner has satisfied the first prong required to excuse procedural default, courts "conduct a preliminary assessment of [the] underlying claim." *Id.*

---

[2] There is no dispute in relation to elements three and four of this test as recited in *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014), namely: (3) the state post-conviction review proceeding was the initial review proceeding; and (4) state law required the petitioner to bring the claim in the initial review collateral proceedings. (*See* Doc. 17 at 25–26.) Consequently, these have been omitted from our review.

Judge Johnston recognized that both the test for excusing Stock's procedural default and his underlying claim require the Court to "turn a *Strickland* analysis." (Doc. 39 at 2.) However, in conducting the preliminary assessment, Judge Johnston determined that the underlying claims for ineffective assistance of counsel did not have merit under *Strickland v. Washington*, 466 U.S. 668 (1984). Consequently, Judge Johnston bypassed the *Martinez* substantiality and ineffective assistance of post-conviction relief counsel analysis and recommended that this Court dismiss the underlying claims on their merits. (Doc. 39 at 2.) The Court agrees that, because Stock cannot satisfy the requirements of *Strickland* in regards to his underlying claims, the Court need not reach an analysis of whether Stock has satisfied his burden to excuse his procedural default under *Martinez*. Further, judicial economy supports denying Stock's underlying claims on their merits.

## I. The merits of the underlying claims

Under *Strickland*, Stock must show two things: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Hardy v. Chappell*, 849 F.3d 803, 818 (9th Cir. 2016) (citing *Strickland*, 466 U.S. at 687). To establish deficient performance, Stock must "show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 688). "A court

-4-

considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Stock must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To establish prejudice, Stock must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough for Stock "to show that the errors had some conceivable effect on the outcome of the proceeding," he must show that counsel's errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687, 693.

Since both prongs of the test must be satisfied, a court need not address "both components of the inquiry if the defendant makes an insufficient showing in one." *Strickland*, 466 U.S. at 697. Further, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.*

## A. Claim 2(e): Failure to retain a DNA expert

Stock was permitted to further develop the facet of his claim alleging that his trial counsel, Chad Wright ("Wright"), was ineffective for failing to retain a DNA expert to testify regarding the findings made by the State's DNA expert concerning an analysis of E.S.'s bedding materials. Stock deposed Wright and determined that Wright had actually retained a DNA expert, Elizabeth A. Johnson ("Johnson"), but ultimately decided not to call her at trial.

Wright disclosed that Johnson had reviewed the DNA testing and report before concluding that the testing had been performed properly and that she agreed with the results. Moreover, there was no indication to Johnson that the State's experts had mischaracterized the DNA evidence. (Doc. 27-1 at 186–87.) Nonetheless, Wright indicated that Johnson had told him that because Stock's DNA was on E.S.'s bedding "at least in some part, that the jury would be swayed by that even though there was no connection between [E.S.'s] DNA that they found on the bedding, they could have just overlapped randomly is what she's saying." (*Id.* at 54.) Johnson and Wright apparently discussed how the prosecution "could expand [the DNA evidence] to mean completely opposite of what [it] did actually mean." (*Id.* at 57.)

Judge Johnston determined, and this Court agrees, that Wright's failure to call Johnson did not constitute ineffective assistance of counsel. Judge Johnston found that the concerns expressed in Johnson's conversations with Wright were adequately aired through Wright's cross-examination and re-cross-examination of Megan Ashton ("Ashton"), one of the State's DNA experts, and re-emphasized in Wright's closing argument. (Doc. 39 at 5–6.)

Wright elicited testimony from Ashton including: that Stock could not be conclusively identified in the tested samples; that at least three individuals contributed to the DNA profile in some of the samples; that the only sperm cells identified in the samples came from E.S.; that her testing could not reveal how a mixture of two sources of DNA came to be deposited on the sample, whether the DNA was mixed together at the time of deposit or one superimposed or deposited upon the other; and that Stock could not be excluded from either the areas stained by E.S.'s sperm cells or the areas outside of those stains. (Doc. 12-5 at 42–43.) Further, Ashton testified on re-cross that Stock's DNA could have been deposited from the contact of the bedding with Stock's skin as a result of Stock changing E.S.'s bedding, and that "any sort of skin to item contact would definitely increase the chance of DNA transfer." (*Id.* at 45.) Importantly, Wright elicited Ashton's admission that had this sort of DNA transfer occurred from changing the bedding

prior to E.S. ejaculating onto the bed, the result would be indistinguishable from the profile resulting from both DNA deposits being made during a sexual act. (*Id.* at 44.)

As Judge Johnston found, Wright emphasized these points during his closing argument, clarifying what the DNA evidence could show to the jury. (Doc. 39 at 6.) Wright stated:

> Instead, they focus on the DNA on [E.S.'s] mattress, even though it's the same—in the stains, the same amount of DNA in the stains as it is outside of the stains. . . . Because skin is only relevant—in this circumstance, with [Stock] making the bedding, doing the laundry, changing all these things, skin is only relevant if it's associated with the stain. And those experts came in and said, I can't tell you because the proportions are the same inside the stain, the proportion [*sic*] are the same outside the stain. That means the skin could have been there, the stain came on top.

(Doc. 12-7 at 51.) In his deposition, Wright stated that he thought the DNA evidence was "neutral." Further, Wright stated that "this idea that [Stock's] DNA could have been overlapped by [E.S.'s] semen that came in later. . . . was pretty simple." (Doc. 27-1 at 88.)

Based upon all of this evidence and the fact that there was no dispute with the actual findings and testimony presented by the State's DNA experts, Judge Johnston determined that Wright's conclusion that Johnson's testimony was unnecessary was objectively reasonable for purposes of *Strickland.* (Doc. 39 at 6.)

"In short," Judge Johnston concluded, "Stock has failed to demonstrate that Wright's performance fell 'outside the wide range of professionally competent assistance.'" (*Id.* at 8 (quoting *Strickland*, 466 U.S. at 690).) Although Judge Johnston correctly determined that he need not analyze whether or not Stock had satisfied the second prong of *Strickland*—prejudice—Judge Johnston found that Stock could not show the requisite prejudice. (*Id.* at 13–14 (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)). Noting that Johnson agreed with the findings and trial testimony given by the State's DNA experts, Judge Johnston concluded that additional expert testimony relating to the undisputed DNA testing "may not only have been unnecessary, it is unclear whether such testimony would have actually been favorable to Stock." (*Id.* at 14.) Consequently, Judge Johnston determined that this claim should be denied as "conclusively lacking in merit." (*Id.* at 15.)

There are two things worth noting at this juncture. First, based upon her concern that the DNA evidence could be misconstrued, Johnson suggested that Wright file a motion for the DNA evidence to be excluded under Federal Rule of Evidence 403. (Doc. 27-1 at 54.) Although Judge Johnston has discussed why the absence of the suggested motion to exclude does not constitute ineffective assistance by Wright, and although the parties have now argued their positions

regarding Stock's claim that this failure does constitute ineffective assistance, the Court will not address this issue further. (Doc. 39 at 6–7.) This issue has not been raised previously and is, therefore, not properly before the Court. The procedurally defaulted claim at issue is whether Wright provided ineffective assistance in failing to call a DNA expert at trial, not whether Wright was ineffective for failing to heed the advice of his retained DNA expert to file a Rule 403 motion. Second, Stock has again attempted to inject his claim that Wright was ineffective for failing to object to the State's statement during closing argument that Stock's DNA was "all over" the bed. This claim has already been denied and Stock will not be allowed to "make an end run around this prior ruling by collapsing his former claim . . . into [this] pending argument that Wright performed deficiently by failing to obtain a DNA expert." (Doc. 39 at 7–8.) The Court will not entertain Stock's attempts to expand the scope of the procedurally defaulted claim currently under analysis.

Stock's objections to Judge Johnston's analysis can be separated into three categories: (1) Wright should have filed a motion to exclude the DNA evidence; (2) Wright should have objected to the State's closing argument that Stock's DNA was "all over" E.S.'s bed; and (3) because Wright has not offered a "reasonable explanation" for his failure to present Johnson's testimony at trial, his conduct was deficient under *Strickland*. (Doc. 40 at 9–13.) As noted above, the Court will not

consider Stock's attempts to turn his claim that Wright was ineffective for failing

to call a DNA expert at trial into a claim that Wright was ineffective for failing to

file a motion to exclude.  Consequently, all of Stock's objections in regard to this

matter are overruled.  Similarly, as noted above, the Court will not entertain

Stock's attempts to contort his previously denied claim that Wright was ineffective

for failing to object during the State's closing argument into a tenuous facet of his

pending claim.  Therefore, all of Stock's objections in regard to this matter are also

overruled.  As a result, the Court need only address Stock's objections to the extent

they fall into the third category.

Stock's objections in this regard are unsupportable.  Stock asserts that Judge

Johnston erred by "arguing that there is no way to determine whether [Wright]

would have tempered the prosecutor's arguments in the case. Yet this misses the

point. The question is not whether [Wright] could have precluded this particular

prosecutor from making this type of argument to the jury." (Doc. 40 at 10 (internal

citation omitted).)  According to Stock, Judge Johnston should have asked

"whether Wright could have—and should have—taken steps to ensure that the jury

was not misled by the prosecutor's presentation of the evidence." (*Id.*)  While

Judge Johnston may not have included that precise expression of the question in

his Findings and Recommendations, it is undoubtedly the specific question he

answered through his analysis. Judge Johnston enumerated the various ways by which Wright took "steps to ensure that the jury was not misled" by the presentation of the DNA evidence, namely that Wright had emphasized the misconstructions that could be given to the DNA evidence during Ashton's cross-examination and re-cross-examination and again during his closing argument. (Doc. 39 at 4–6.) Stock's argument in this regard is in blatant contradiction to the analysis performed by Judge Johnston.

Stock then asserts that "because there is no reasonable explanation for Wright's failing except for a lack of prudence, this Court should conclude that his conduct was deficient within the meaning of *Strickland*." (Doc. 40 at 12.) In support, Stock does not direct the Court's attention to any case establishing this law but instead merely states that "the only explanation that Wright could suggest in this case was a generic one—or what he described as a 'minimalist approach' to experts." (*Id.* (quoting Doc. 27-1 at 184).) This argument again is contradicted by Judge Johnston's conclusion and, moreover, omits an important statement by Wright regarding his decision not to call Johnson at trial. During Wright's testimony he stated that he "made the decision just to go ahead with cross-examining the State's expert on that rather than presenting [Johnson.]" (Doc. 27-1 at 86.) Regarding Wright's decision, Judge Johnston concluded that "Wright's

determination that Johnson's expert testimony was not necessary was an objectively reasonable one." (Doc. 39 at 6.) In light of the fact that this was certainly a strategic decision, even if Wright has not proffered up a "reasonable explanation" to satisfy Stock years after the trial, it does not constitute deficient performance for purposes of *Strickland*. "Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present 'are virtually unchallengeable' if 'made after thorough investigation of law and facts relevant to plausible options.'" (Doc. 39 at 13 (quoting *Strickland*, 466 U.S. at 690).)

Again, in order to succeed, Stock must show that Wright's representation fell below an objective standard of reasonableness and overcome the strong presumption given to the reasonableness of Wright's assistance. *Harrington*, 562 U.S. at 104. Stock has conclusively failed to carry this burden. As a result, the Court refrains from analyzing whether or not Stock has established prejudice. *Hendricks*, 70 F.3d at 1039. Stock's Claim 2(e) is denied as lacking merit.

## B. Claim 2(g): Failure to present medical expert testimony

During Stock's trial, his daughter, K.S., who was seven years old at the time, testified to the following:

> Well, [Stock] did something called a private thing, and it was—he was—he got his little peanuts thing, whatever it's called, uhm, and he stuck it in my butt or I had to suck on it with my mouth, and that was

> really gross. . . . He would put this little—well, I don't know what it's
> called, but it would be like cream or something. . . . And he would
> stick it in my privates, like my butt or my crouch, and then he would
> start—well, it would start hurting. . . . Well, he would put a little—
> well, I don't remember what it taste like, but it was just—it looked
> like a strawberry thing or something but it wasn't really, and he would
> put it on his private and then he would make me suck on it.

(Doc. 12-2 at 19–20.) When K.S. was asked how she knew it was over, she

testified:

> Well, because he would take this thing that looked like milk, but it
> really wasn't because somebody told me that or something, and
> flushed it down the toilet. He put it in his hands and then—uhm, then
> he put it in the toilet. Then he made me go to the bathroom.

(*Id.* at 21.)

Stock bases this facet of his ineffective assistance of counsel claim upon the

contention that Wright was ineffective for failing to present a medical expert to

testify that if Stock's daughter actually suffered the abuse she described, there

would have been signs of significant injury to her hymen. In his initial Findings

and Recommendations, Judge Johnston found that it was unclear whether or not

Wright had adequately explored the medical findings in regards to K.S. Because

there was nothing in the record concerning Wright's action or inaction in this

regard, Judge Johnston allowed Stock to develop his claim further in discovery.

(Doc. 17 at 37.) Following Wright's deposition, it was discovered that he had

consulted a medical expert, Dr. Stephen R. Guertin ("Dr. Guertin"), but ultimately decided not to call him at trial.  (Doc. 27-1 at 110–11.)

In the current Findings and Recommendations, Judge Johnston began his analysis of the second facet of Stock's claim by reiterating several important facts. First, when K.S. underwent a medical examination after her disclosure of abuse, the results were normal.  Second, Dr. Erin Keefe ("Dr. Keefe"), K.S.'s examining physician, did not identify any physical evidence that would corroborate a claim of sexual abuse.  Lastly, Dr. Keefe did not provide an opinion that K.S. had been sexually abused and would not have been comfortable doing so in light of the normal examination.  (Doc. 39 at 8 (citing Docs. 27-1 at 94–95; 32 at 28).)

Looking to Wright's investigation into the medical examination of K.S., Judge Johnston found that although Dr. Guertin opined that "full penile-vaginal intercourse did not occur" and that he thought the medical examination "strongly called into question the possibility of that form of intercourse," it was important to note that Dr. Guertin "could not eliminate other lesser forms of abusive sexual contact."  (*Id.* at 9 (citing Docs. 27-1 at 114–15; 33 at 9–10).)  Judge Johnston determined that the possibility of effectively disputing the occurrence of full penile-vaginal penetration "would not defeat the incest charge."  (*Id.* at 12.)

A person commits the offense of incest under Montana Law if the person knowingly "has sexual intercourse with, or has sexual contact," with a descendant, "or any stepson or stepdaughter." Mont. Code Ann. § 45–5–507(1). Sexual contact is defined as a "touching of the sexual or other intimate parts of the person of another, directly or through clothing, in order to knowingly or purposely: (a) cause bodily injury to or humiliate, harass, or degrade another; or (b) arouse or gratify the sexual response or desire of either party." § 45–2–101(67). As recognized by Wright, it "wouldn't matter" for the incest charge "if there was penetration or not." (Doc. 27-1 at 228.)

Judge Johnston found that Wright's defense theory was to call into question the veracity of K.S.'s allegations rather than to dispute their substance. (*Id.* at 12.) The theory being that K.S. was coached into making the allegations by her mother in the wake of her acrimonious divorce from Stock. (*Id.*) Wright called Dr. Philip Esplin during trial to testify to the prevalence of false reports in such contentious scenarios. (Doc. 12-4 at 37–47.) In light of the defense theory that the abuse alleged by K.S. never happened, Judge Johnston found that "it would not have mattered that there was an additional expert to opine that full penile-vaginal penetration did not or could not have occurred." (Doc. 39 at 12.) Moreover, Dr. Guertin could not rule out slight or gentle penetration. (*Id.*)

Because the State did not need to prove full penile-vaginal intercourse to convict Stock of incest under Montana Law and Dr. Keefe testified as to the lack of signs of abuse in K.S.'s medical examination, Judge Johnston concluded that Wright's decision not to call Dr. Guertin could be considered "sound trial strategy." (Doc. 39 at 12–13 (quoting *Darden v. Wainwright*, 477 U.S. 168, 186 (1986).) Similarly, in light of these facts, Wright's strategy to discredit K.S. was also reasonable. (*Id.* at 13.) "Strategic decisions," Judge Johnston concluded, "such as the choice of a defense or which witnesses or other evidence to present, 'are virtually unchallengeable' if 'made after thorough investigation of law and facts relevant to plausible options.'" (*Id.* (quoting *Strickland*, 466 U.S. at 690).)

Although Stock could not establish deficient performance, Judge Johnston undertook an analysis of whether Stock could establish prejudice. (*Id.* at 13–15.) Judge Johnston found that because Dr. Keefe testified at trial that K.S. had a completely normal exam which was negative for any indicators of sexual abuse, "additional expert testimony relating to . . . the lack of medical findings, may not only have been unnecessary, it is unclear whether such testimony would have actually been favorable to Stock." (*Id.* at 14.) Judge Johnston determined that Stock had not established "a reasonable probability that would undermine this

Court's confidence in the outcome of trial." (*Id.* at 15.) Accordingly, Stock's claim should be denied as "conclusively lacking in merit." (*Id.*)

There are two initial matters concerning Stock's objections to Judge Johnston's analysis and conclusion in this regard which require discussion. First, Stock again attempts to resurrect insubstantial and previously denied claims in his current objections. Stock claims that Wright provided ineffective assistance because he was burdened by a conflict of interest in regards to Dr. Keefe owing to the fact that Wright's child had been examined by Dr. Keefe in the past. Stock asserts that this "conflict" caused Wright to inadequately perform pretrial investigation into medical issues, ineffectively cross-examine Dr. Keefe, and elicit damaging testimony. Stock claims that this previously denied claim is "inextricably intertwined" to his currently pending claim and the Court should "reject the artificial distinction" drawn by Judge Johnston. (Doc. 40 at 13.) In again attempting to convolute previously denied claims with pending claims, Stock displays a lack of appreciation for the process of habeas review and a flagrant disregard for the finality of this Court's decisions in regards to his claims. The Court will not re-examine Stock's denied claims at this juncture and all of his objections in this regard are overruled.

Second, Stock appears to object, without citing to any legal support, to Dr. Keefe being qualified as an expert witness during his trial. (Doc. 40 at 14, 17.) Stock references Dr. Keefe's statement during her deposition that she does not consider herself to be an expert regarding child sexual abuse. (Doc. 32 at 4.) As the State points out, "the State had no choice but to call [Dr. Keefe] because she physically examined E.S. and K.S." (Doc. 44 at 24.) Moreover, the State adds, just because Dr. Keefe doesn't consider herself an expert in child sexual abuse "does not mean that her medical training generally, and her child sexual abuse training specifically along with her years of performing sexual abuse examinations, does not qualify her as an expert witness." (*Id.* at 25–26.) However, as this claim is novel to these proceedings and has not been sufficiently developed, to the extent that Stock's objection raises this contention, it is overruled.

Moving to the bulk of Stock's objections, the Court is not convinced that they warrant rejection of Judge Johnston's findings and recommendations. Stock objects that Judge Johnston "failed to discuss the import" of newly developed facts supplied by the "testimony from two respected experts who confirm that penile-vaginal intercourse did not occur." (Doc. 40 at 15.) In support, Stock cites the Court to the declarations of Dr. Guertin and Dr. Phillip Welch ("Dr. Welch"). Stock contends that this evidence "conclusive[ly]" establishes "that certain aspects

-19-

of K.S.'s claims were wholly unbelievable." (*Id.*) Stock argues that this evidence would have served to "rebut the unreliable testimony of Dr. Keefe." (*Id.*) The "unreliable testimony" provided by Dr. Keefe apparently being her testimony concerning the time-frame and potential for healing of a pre-pubertal girl's hymen. (*Id.* at 15, 19.) Stock emphasizes that this evidence shows that Wright failed to adequately prepare for the medical evidence and allowed the State to "present misleading evidence to the jury." (*Id.* at 19.)

Stock further objects to Judge Johnston's conclusion that Wright strategically decided to attack the reliability of K.S.'s allegations as being coached instead of presenting a medical expert to testify to the unlikelihood that K.S. suffered the abuse she alleged. Stock claims that Judge Johnston's analysis is flawed because the two strategies are not "mutually exclusive." (*Id.* at 15.)

Additionally, Stock asserts that Judge Johnston erred in deeming Stock's medical experts' opinions to be unnecessary in light of the fact that the State did not need to prove full penile-vaginal intercourse to convict Stock of incest. Stock argues that the "missing evidence" tending to show that K.S. did not suffer the abuse she alleged "would most-certainly raise very significant questions—and perhaps a reasonable doubt—as to the reliability of the witness's claims against the defendant." (*Id.* at 17.) Without analysis, Stock cites a list of cases for his

proposition that "trial counsel is ineffective if she fails to respond to crucial medical evidence."[3] (*Id.* at 18.)

All of Stock's objections fail to establish that Wright's assistance "fell below an objective standard of reasonableness." *Harrington*, 562 U.S. at 104. While Wright could have called Dr. Guertin to testify as to the unlikelihood that K.S. suffered the abuse she alleged, he reasonably chose not to.

Stock relies heavily upon the declarations of Dr. Guertin and Dr. Welch to suggest that Wright's decision not to call Dr. Guertin was patently unreasonable. However, Dr. Guertin was consulted before trial and his opinions now "are no different than the opinions stated to attorney Wright in November 2009." (Doc. 33 at 4.) While Dr. Guertin's opinion was that K.S. did not suffer full penile-vaginal intercourse, this opinion gains Stock little when compared to Dr. Keefe's testimony that K.S. had a normal exam with no indications of abuse. Further, Dr. Guertin admits that, while unlikely, it was possible "K.S. has been the victim of intercourse, but any injury has healed to the point of appearing normal" because

---

[3] None of these cases establish that failure to call a medical expert who counsel has consulted before trial establishes deficient performance, particularly when the "crucial medical evidence" presented by the State—that K.S. had a normal exam absent of indicators of abuse—is not disputed by the defense expert who would have been called. Again, strategic decisions, "such as the choice of a defense or which witnesses or other evidence to present, 'are virtually unchallengeable' if 'made after thorough investigation of law and facts relevant to plausible options.'" (Doc. 39 at 13 (quoting *Strickland*, 466 U.S. at 690).)

"[p]re-pubertal transections heal to what could be considered a normal exam <15% of the time." (*Id.* at 9.) Dr. Welch's declaration is similarly unavailing. Dr. Welch declared:

> I do not quarrel with the testimony of Dr. Keefe, although it is quite broad and general in nature. I agree that it is not uncommon to see normal examinations in legally confirmed cases of sexual abuse. I also agree that some injuries to the vagina can heal over time even without the need for medical intervention or treatment.

(Doc. 27-9 at 2.) Despite Stock's repeated assertions to the contrary, neither doctor has provided "conclusive evidence" to support Stock's contention that Wright's decision not to call his own medical expert fell shy of what "any reasonably competent attorney" would have done. (Doc. 40 at 17.) Even if allowed "the distorting effects of hindsight," Stock cannot establish that Wright's decision not to call Dr. Guertin was unreasonable. *Strickland*, 466 U.S. at 689.

The Court is convinced that Wright's decision not to call Dr. Guertin was a reasonable strategic decision made after consulting with Dr. Guertin, listening to Dr. Keefe's testimony, and cross-examining Dr. Keefe. Consequently, Stock cannot establish deficient performance and this Court need not analyze whether or not Stock was prejudiced by Wright's decision. This claim is denied as lacking merit.

## II. Stock's renewed objection that cumulative error analysis has not been performed and separate analysis of the facets of his "claim" is an unreasonable application of Federal law

Stock renews his previously overruled objection to Judge Johnston's earlier Findings and Recommendations, taking issue with what he perceives as a failure of both the Montana Supreme Court and Judge Johnston to "conduct a cumulative error review" he contends is "required by *Strickland*." (Doc. 40 at 5.) Stock argues that this failure renders the Montana Supreme Court's application of established Federal law unreasonable for purposes of the AEDPA. (*Id.*) As a result, Stock asserts that this Court should conduct a *de novo* review of all of the errors he has attributed to his trial counsel which comprise a "unified" Claim 2 in order to determine whether the cumulative effect of these alleged errors was prejudicial. (*Id.*) At bottom, Stock objects to the "balkanized review" of what he deems to be a "single, broad claim of IATC." (*Id.* at 3.) This Court has previously overruled this objection, (*See* Doc. 28 at 7–10), and is unconvinced that any aspect of that prior decision should be changed in light of Stock's renewed objection. Again, the Montana Supreme Court and Judge Johnston each reviewed Stock's arguments individually, found no prejudice resulting from any alleged error, and concluded that without prejudice, there could be no cumulative error to review. However, as Stock has cited to two additional cases in support of his renewed

objection, the Court refrains from summarily overruling Stock's renewed objection solely to the extent necessary to express why Stock's additional support does not warrant a different result.

First, while the Ninth Circuit has applied the concept of cumulative error in the context of *Strickland, see Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995), some circuits disagree. *See, e.g., Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). Nonetheless, whether or not the cumulative error analysis urged by Stock constitutes clearly establish Federal law for purpose of AEDPA is irrelevant here because Stock has not shown *any* deficiencies by Wright. Unlike the court in *Harris*, this Court is not "compelled to find" cumulative prejudice resulting from eleven instances of deficient performance. *Harris*, 64 F.3d at 1438. Instead, this Court has not found any substantial error in any aspect of Stock's claims and his claim must be rejected.

Second, Stock has failed to address whether or not the "cumulative" review he believes has been lacking should include the review of the possible cumulative effect of the facets of his "claim" that are procedurally defaulted or that were dismissed for failure to state a claim. Further, including procedurally defaulted claims, claims upon which Stock failed to state a claim, and discrete and

unconnected claims spanning the entire judicial process in a single claim does not make his claim a "unified whole" for purposes of review. (Doc. 40 at 5.) The Court sees no sensible reason to conduct a cumulative error analysis which includes these claims in its purview.

Third, Stock's reliance upon *Yates v. Sinclair*, No. C13-0842RSM, 2016 WL 6494569 (W. D. Wash. Nov. 2, 2016), and *Johnson v. United States*, 860 F. Supp. 2d 663 (N. D. Iowa 2012), is misplaced as neither case supports the contention that a court may not separate any portion of an ineffective assistance of counsel claim for discrete review. The court in *Yates* was addressing only the multiple facets of Yates' "Claim 10" which alleged ineffective assistance of counsel in the "investigation and presentation of mitigation phase evidence" and was distinct from Yates' "Claim 2," which alleged ineffective assistance of counsel at the time that Yates pled guilty, when the court stated that "*Strickland* does not support a 'balkanized' review of individual facets of a single claim of ineffective assistance of counsel." *Yates*, 2016 WL 6494569, at *7, 10–12. The separate claims in *Yates* are distinct from Stock's single, multifaceted, "broad claim" which alleges unconnected instances of ineffective assistance spanning from the pre-trial motions to closing arguments.

The decision in *Johnson* is similarly unavailing to Stock's argument. In determining "what allegations of error constitute a single, multifaceted claim of ineffective assistance of counsel, rather than separate claims," the court in *Johnson* reasoned that:

> *Strickland, Williams, Wiggins,* and *Porter* support review of a multifaceted claim of ineffective assistance of counsel in the investigation and presentation of mitigation evidence in the mitigation phase as a single claim. On the other hand, none of them suggest that all of the alleged errors of counsel *throughout the case*, or even that *all of the allegations of errors, of various types, in the mitigation phase* can be considered as a single, multifaceted claim of ineffective assistance of counsel.
>
> . . .
>
> [T]he different formulations in *Strickland* . . . suggest that it is improper to consider all of the deficiencies of counsel throughout the trial as facets of a *single* claim to determine prejudice. Rather, they suggest that multiple facets of ineffective assistance of counsel *in a discrete phase of the trial* may constitute a *separate* claim of ineffective assistance of counsel from allegations of error in a different phase.

860 F. Supp. 2d at 762 (emphasis in original). The *Johnson* court ultimately concluded that "consideration of each of the subtopics concerning Johnson's counsel's errors in the mitigation phase as a *separate* (albeit multifaceted) claim of ineffective assistance of counsel is justified." *Id.* at 763–64 (emphasis in original).

Consequently, neither of Stock's cited cases support his contention that he has presented a single unified claim that could not be parsed out and reviewed according to its discrete subparts. Stock's objection is again overruled.

## III.    Stock's objection requesting an evidentiary hearing

Without laying out the framework by which the need for an evidentiary hearing is determined under the AEDPA, Stock broadly asserts that "this Court should schedule an evidentiary hearing to resolve all disputed matters." (Doc. 40 at 8.) Title 28 U.S.C. § 2254(e)(2) provides that if a petitioner failed to develop the factual basis of a claim in State court proceedings, the Court cannot hold an evidentiary hearing on the claim unless petitioner shows that the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence" and "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Stock has not presented any argument or analysis as to how he has satisfied these requirements. The Court will not undertake counsel's tasks and declines to address Stock's legally and factually inadequate request. Consequently, Stock's objection is overruled.

IT IS ORDERED that Judge Johnston's Findings and Recommendations and Order (Doc. 39) are ADOPTED IN FULL. Stock's remaining claims, Claims 2(e) and 2(g) are DENIED for lack of merit.

IT IS FURTHER ORDERED that the Clerk of Court will enter by separate document a judgment in favor of Respondents and against Petitioner.

IT IS FURTHER ORDERED that a Certificate of Appealability is DENIED as there are no close questions and no reason to encourage further proceedings.

DATED this **30**th day of April, 2018.

Dana L. Christensen, Chief Judge
United States District Court